**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **H.D., A MINOR, BY AND THROUGH HIS PARENTS, JEFFREY D. AND PATRICIA H.,**<br><br>v.<br><br>**KENNETT CONSOLIDATED SCHOOL DISTRICT** | **CIVIL ACTION**<br><br>**NO. 18-3345** |

**MEMORANDUM**

I.    **Introduction**

    a.  In this case, the Court is called to decide whether to sustain or reverse the opinion of the Hearing Officer who concluded that Defendant Kennett Consolidated School District ("the District") fulfilled its obligations to one of its students, H.D.

    b.  H.D. has received treatment for anxiety and obsessive-compulsive disorder for most of his life. However, he maintained good grades through his sixth-grade year. His grades, attendance, and behavior began declining in seventh grade, and the District began providing him individualized accommodations and support in his eighth-grade year. Nonetheless, Plaintiffs, his parents ("the Parents") removed him from the District and put him in alternative educational placements towards the end of his eighth-grade year. They now seek reimbursement for H.D.'s alternative educational placements and other expenses incurred while they pursued what they felt was an appropriate education for their son.

    c.  In May of 2018, a Pennsylvania Special Education Hearing Officer determined that the School District had met its obligations to H.D. under both the Individuals with

Disabilities Education Act ("IDEA") and § 504 of the Rehabilitation Act of 1973 ("§ 504").

d. The Parents appeal that determination.

e. There are three central factual and legal disputes in this case.

  i. First: when the District should have known that H.D. needed specially-designed instruction.

  ii. Second: whether the District acted in a reasonably timely manner once it knew or should have known of H.D.'s need for specially-designed instruction.

  iii. Third: if the District violated any of its obligations to H.D., what relief is warranted.

f. For the reasons that follow, the Court will not disturb the Hearing Officer's rulings that the District met its obligations to H.D. and that the Parents are not entitled to any relief.[1]

g. As described in the Hearing Officer's Final Decision and Order ("Hearing Officer's Decision"), the District did not know, and need not have known, that H.D. needed specially-designed instruction until shortly before the Parents removed him to his first alternative educational placement. Given that conclusion, the Hearing Officer's subsequent finding that the District was addressing deficiencies in H.D.'s educational program in a reasonably timely manner is also supported by the record. Finally, since the District did not violate any of its obligations to H.D., no remedies are warranted.

h. The Court will therefore GRANT the District's Motion for Judgment on the Administrative Record and DENY the Parents'.

---

[1] ODR File Number 19914-17-18 (Office for Dispute Resolution May 10, 2018), https://odr-pa.org/uploads/hearingofficerdecisions/19914-17-18.pdf.

II. **Procedural History**

a. In November of 2017, the Parents filed a Due Process Complaint against the District asserting that the District denied H.D. a free, appropriate public education ("FAPE") under IDEA, § 504, and the ADA, as well as implementing regulations through his seventh- and eighth-grade years.

b. The parties held a four-day hearing before a Pennsylvania Special Education Hearing Officer on February 6, 20, and 27, and April 13, 2018.

c. The Hearing Officer ruled for the District on May 10, 2018.

   i. After reviewing the evidence, the Hearing Officer determined that the District was aware during H.D.'s seventh-grade year that he was encountering some challenges. H.O.D. at 19–20.[2] However, he was not yet exhibiting signs of "a need for accommodations or special education." Id.

   ii. Consequently, the District had neither fallen short of its obligations to identify H.D. as a student with special needs nor denied him a FAPE during his seventh-grade year. Id. at 20.

d. The Hearing Officer also concluded that all the witnesses were 'generally credible," and that none "exhibited a demeanor that suggested a lack of trustworthiness or evasion." Id. at 15.

e. The Parents appealed the Hearing Officer's ruling to this Court by a Complaint dated August 7, 2018. ECF 1.

---

[2] Citations to the Hearing Officer's Decision are given as "H.O.D. at __." Citations to the Hearing Officer's Decision's findings of fact are given as "H.O.D. ¶ __." Citations to the parties' Motions are given as "[Pl./Def.] Br." Citations to the Parents' reply brief are given as "Pl. Rep. Br." Citations to testimony given at the Due Process Hearing are given as "N.T. at ___." Citations to exhibits used at the Due Process Hearing are given as "[P/S]-__ at __."

f. The Parents filed a Motion for Judgment on the Administrative Record on December 26, 2018. ECF 10. The District filed a single brief in support of its Cross-Motion for Judgment on the Administrative Record and in opposition to the Parents' motion on February 18, 2019. ECF 12. The Parents replied on March 5, 2019. ECF 15.

## III. <u>Factual History</u>

With rare exceptions, the Hearing Officer's findings of fact are undisputed. The parties do sometimes dispute what to make of factual ambiguities, or attempt to draw more attention to facts which the Hearing Officer's Decision did not focus on. It is rare that such disputes indicate actual disputes of fact rather than mere disagreements over emphasis. The following review of the facts of the case will clearly identify actual factual disputes among the parties.

a. <u>Background Through Sixth Grade (2014-2015)</u>

   i. H.D. attended school in the District from first grade, beginning in 2009, through March 2017, near the end of his eighth-grade year. N.T. at 37:11-20; S-7.

   ii. In first grade, H.D. began private counseling to address anxiety and Obsessive Compulsive Disorder ("OCD"). N.T. at 827:12-16.

   iii. In January of his second-grade year, the District sought permission to evaluate H.D. for concerns with speech articulation, but hos Parents did not consent. N.T. at 899:7-12, S-2. That February, the District evaluated H.D. for gifted education at his Parents' request. S-1. The report concluded that H.D. was not eligible for gifted services. S-3, S-4. The District recommended that H.D. continue in regular education from that time forward, and his Parents approved. S-4.

   iv. H.D.'s anxiety occasionally manifested in school prior to seventh grade.

1. In May of his second-grade year, a teacher reported to H.D.'s Parents that his behavior had been "off the wall" for two weeks. P-17 at 1. She reported that he "has been unable to follow directions . . . calling out and being extremely off task . . . . He's been making inappropriate noises, shouting out in class, and touching other people. In the hallways, he seems unable to walk without talking or being silly." Id. His Parents now call this "H.D.'s emotional needs manifest[ing] . . . ." Pl. Br. at 6.

2. A third-grade entry in H.D.'s Kennett Consolidated School District Comprehensive Medical Report stated that he suffers from "Anxiety Disorder" without further comment. S-5 at 3.

3. On a few other occasions from third to fifth grade, H.D. was disruptive or anxious, or underperformed, in school. P-17 at 2–10. It is not clear how many of the instances of his behaving disruptively or underperforming stemmed from his anxiety.

v. From third through sixth grades, H.D.'s attendance record included a minimum of ten absences for each school year. S-7 at 2; S-41 at 6. During fifth grade, H.D. also arrived tardy on twelve occasions. S-41 at 6. During the 2014-2015 school year (sixth grade), H.D. arrived tardy on fourteen occasions and was absent nineteen times. S-7 at 2.

vi. Nonetheless, all of H.D.'s final grades were excellent through sixth grade, and he made the Honor Roll in sixth grade. S-7 at 2.

vii. H.D.'s anxiety generally manifested more severely at home than at school.

1. His mother testified that "He's always been the type of kid, he would go to school and he would function, then he would come home and all of his anxieties and fears would come out." N.T. at 852:9-12. She also agreed with the characterization that H.D. "didn't demonstrate [his primary modes of expressing anger] outside of the home." N.T. at 907:10-11, 907:16-19.

2. During his eighth-grade year, his Parents provided input into a § 504 evaluation to the effect that H.D. "hides his worries and anxiety at school and then at home his frustrations surface." S-30 at 1, 7, P-2 at 1. His anxiety and OCD also affected his sleep. E.g., N.T. at 855:8-13, S-30 at 2.

b. Seventh Grade (2015-2016)

i. H.D. received minor discipline on four occasions during his seventh-grade year for making fun of other students and for disruptive behavior outside of the classroom. S-31 at 3–4.

ii. In September of his seventh-grade year, H.D.'s parents (the "Parents") alerted an assistant principal to text messages that H.D. exchanged with a peer, expressing concerns with the peer's language and indicating that H.D. was upset by them. H.O.D. Findings ¶ 15. Others also contacted the assistant principal concerning H.D.'s own problematic use of social media. N.T. at 429:1–430:10; 470:8–474:13, 838:14-22; S-8, S-63, S-65. Overall, school principals did not consider H.D.'s use of social media to be atypical for a middle school student or indicate a need for special education. N.T. at 148:6–149:16, 167:15–168:13, 475:1–476:3.

iii. H.D. inarguably received worse final grades in seventh grade than he did in sixth grade.

1. H.D.'s grades declined particularly noticeably in core, year-long academic subjects:

   a. His final Math grade fell from a B- in sixth grade to a C- in seventh grade;

   b. his final Science grade, from a B+ to a C-;

   c. his final Social Studies grade, from an A- to a D; and

   d. his final Language Arts grade, from a B+ to a B.  S-7 at 1–2.

2. His grades also declined modestly from the first to the second semester.  In the first semester, he received 11 As or Bs and 7 Cs, Ds, or Fs.  In the second semester, he received 9 As or Bs and 7 Cs, Ds, or Fs.  Id. at 1.

3. However, H.D. received more As or Bs than Cs or Ds for final grades, and only one failing final grade (a D in social studies).  H.O.D. Findings ¶ 24.

4. Overall, H.D. received twenty As and Bs for quarterly grades, and only seventeen Cs, Ds, and Fs.  Id.  He received ten As or Bs for final grades, and four Cs or Ds.  Id.  Seven of those ten As or Bs were for quarter- or semester-long classes, such as "Health," "Art," or "STEM."  Id.

5. H.D.'s scores on the Pennsylvania System of School Assessment also decreased in the spring of his seventh-grade year as compared to earlier years.  S-6.

iv. H.D. had twenty-six total absences in seventh grade.  S-7 at 1.  Twenty-four were excused and two unexcused.  Id.

   1. On a few occasions, the Parents explained to the District that H.D. was absent because of illness or planned days off.  H.O.D. Findings ¶ 26 (citing P-17 at 15, 21 (stomach virus); P-18 at 13–14, 17–19 (mono); S-10 at 7 (stomach

problems); S-11 (same); S-13 (planned days off adjacent to winter break); S-53 (mono)).  Other excused absences do not appear to be explained in the record.

    v.    On at least two occasions, the Parents explained to H.D.'s teachers that H.D. had failed to complete homework for reasons unrelated to his anxiety: on one occasion, it was an incident with a family pet, and on the other, a medical appointment.  S-10 at 1; S-19 at 1.

    vi.    The Parents and the Hearing Officer disagree on how often H.D. arrived tardy to school in seventh grade.

    1.    The Hearing Officer concluded that H.D. had "approximately sixteen tardy arrivals, with a number of other occasions of being merely late to school for some unspecified period of time."  H.O.D. Findings ¶ 25.

    2.    The Parents claim that H.D. was tardy on sixty occasions.  Pl. Br. at 18.

    3.    Exhibit S-54 reflects somewhere between fifty and sixty tardy or late arrivals to the first class H.D. attended.  S-54 at 4–7.  It is not clear exactly what, practically speaking, distinguishes tardy from late arrivals.

    4.    Of those fifty-to-sixty tardy or late arrivals shown on Exhibit 54, only nine occurred in the first semester.  Id.  The remaining dozens of tardy or late arrivals occurred in the second semester.  Id.  The uptick in the rate of tardy or late arrivals began in January.  Id.

    vii.    "Teachers occasionally reported [H.D.] having difficulties with written assignments, attention and focus, leaving class to go to the restroom, and participating in class during" seventh grade. H.O.D. Findings ¶ 18.  More specifically:

1. In January of that year, H.D.'s father exchanged emails with H.D.'s Social Studies teacher about H.D.'s performance in class.  S-13.

    a. The teacher reported that H.D. was quiet, showed little effort in his written work, and "seemed to suffer more from [the class being early in the morning] than most of his classmates."  <u>Id.</u> at 3.

    b. H.D.'s father responded that "H.D. is definitely not a morning person and getting him to get enough sleep is an issue," and that "He is an anxious kid and if he perceives things are not going well it can feed on itself and I think he can feel intimidated."  <u>Id.</u> at 2.

    c. The two eventually met on January 28, 2016.  P-18 at 1.

2. On February 2, 2016, an Assistant Principal emailed H.D.'s teachers seeking information about H.D.'s in-class behaviors in preparation for a call with H.D.'s Parents.  <u>Id.</u> at 2.

    a. H.D.'s Music teacher reported that he would "act[] silly and not totally 'with it,'" that "[h]is apathy and lack of effort impacts his performance in class," and that "[h]e is belligerent and argumentative when spoken to about his behavior."  <u>Id.</u>  She believed that all of these behaviors had escalated over the course of the year, and that "[h]is grades are not terrible, but should be much better."  <u>Id.</u>

    b. His Physical Education teacher reported that H.D. "works well independently in gym class. . . .  I haven't noticed any troublesome behaviors."  <u>Id.</u> at 3.

c.  H.D.'s Social Studies teacher wrote a brief message: "Quiet as usual.  Has been participating more since meeting with dad."  <u>Id.</u> at 5.

d.  His Math teacher said that H.D. "is not a behavior problem during instruction.  However, maintaining attention is a struggle for him.  I do think he wants to do well.  It is interesting, however, that [H.D.] leaves the class every day to use the bathroom. . . .  This interruption makes the flow of instruction even more of a challenge for him."  <u>Id.</u> at 6.

e.  His Language Arts instructor said, "He has been a little more inattentive than usual, however I have not seen any super alarming behaviors. He and the other boys like to bang their pencils and do other immature annoying distractions..."  <u>Id.</u> at 7.

f.  Finally, his Computer Instruction teacher reported that H.D. "appears to be quieter socially.  His energy seems down.  He's had no significant behavioral issues since the incident with [redacted].  I know this isn't about behavior, but his grade as [sic] dropped . . . ."  <u>Id.</u> at 8.

g.  Each of the teachers responded individually to the Assistant Principal.  <u>Id.</u> at 2–8.

3.  On February 9, 2016, H.D.'s Math teacher sent an email to H.D.'s Parents with comments substantially similar to what she had sent to the Assistant Principal the week before.  <u>Id.</u> at 9.

4.  On February 23 and 24, 2016, H.D.'s father again exchanged emails with H.D.'s Social Studies teacher about H.D.'s participation and homework completion.  <u>Id.</u> at 11.

viii. District staff testified that, overall, they did not consider H.D.'s difficulties with social skills, feeling overwhelmed in class, anxiety behaviors, tiredn**ess,** or participation in class in his seventh-grade year to be atypical of middle-school students such that H.D. would have required support other than that provided by regular education. N.T. at 354:5–355:8, 535:20–536:22, 542:15-24, 635:14–636:11, 663:21-25, 675:10–676:2, 692:2-7; P-19 at 39–41. The Hearing Officer considered this testimony "persuasive and compelling." H.O.D. at 19–20.

ix. On February 12, 2016, H.D. visited the school nurse because of anxiety symptoms, which both his guidance counselor and H.D.'s mother described as a "panic attack." S-53 at 3. Before visiting the nurse, he had attempted to visit his guidance counselor, but she was unavailable that day. N.T. at 403:15–404:1; 842:5-10. After that incident, the guidance counselor kept in touch with H.D.'s Parents concerning H.D.'s anxiety and H.D.'s becoming overwhelmed when working on homework. Id. at 342:19–345:11.

x. Towards the end of H.D.'s seventh-grade year, H.D.'s guidance counselor, following instructions from a school administrator, contacted his mother to ask for documentation of his anxiety diagnosis. N.T. at 303:9-24; P-18 at 23–25.

   1. His mother mentioned the request in a separate email to the school nurse the same day. P-18 at 25. The nurse replied, "Yes, to include Anxiety in his IEP we need a medical diagnosis." Id. at 24. His mother replied, "We have not requested an IEP for [H.D.] and I was a bit confused by the request for" documentation. Id. at 23. The guidance counselor followed up to explain that the District did not intend to give H.D. "and [sic] IEP or any other

documentation," but that they were simply trying to understand whether H.D.'s anxiety "[wa]s a medical diagnosis that should be noted in his medical file or not." <u>Id.</u>

2. The guidance counselor testified before the Hearing Officer that she was also trying to understand whether that entry was accurate or a data-entry error that should be corrected. N.T. at 371:9–372:7.

3. According to H.D.'s guidance counselor, H.D.'s mother was "a bit confused and maybe taken aback by [the counselor's] request" for documentation, and was "uncertain of [her] intentions," <u>id.</u> at 373:17-22, and therefore responded "with hesitation," <u>id.</u> at 302:25–303:2, 305:5-22. (H.D.'s mother later testified to the effect that there was no hesitation between "May the 3rd and May the 4th when [she] requested the letter from the doctor." <u>Id.</u> at 849:16–18.) The counselor attempted to clarify to H.D.'s mother that she did not intend "to do anything negative with the information." <u>Id.</u> at 373:22–374:4.

4. H.D.'s mother later testified that at the time, she "did know what an IEP was." <u>Id.</u> at 917:14.

5. H.D.'s Parents received a doctor's note documenting H.D.'s anxiety diagnosis on May 4, 2016, the next day, and provided it to the District five days later, on May 9. S-53 at 6.

xi. Sometime in the spring of H.D.'s seventh-grade year, his guidance counselor contacted another District representative to discuss whether H.D. should be supported by a § 504 service agreement. N.T. at 36:7–37:1.

xii. On June 8, 2016, at the very end of H.D.'s seventh-grade year, H.D.'s guidance counselor met with H.D.'s Parents to discuss H.D.'s difficulties and whether he should be supported by a § 504 service agreement. S-64 at 1. The record does not reflect that the Parents requested special education or a § 504 service agreement at that meeting.

c. Eighth Grade (2016-2017) and After

i. Events Early in the Year

1. Early that fall, one of H.D.'s Parents notified H.D.'s guidance counselor that was entering the building tardy because he would sit in his car in the parking lot feeling anxious and overwhelmed. S-22 at 4. In the same communication, the Parent asked about whether H.D. could take a different foreign language class. Id.

2. Two days later, H.D. visited the nurse for reported anxiety. H.O.D. Findings ¶ 30.

3. In mid-September, the Parents met with a District school psychologist and H.D.'s counselor to discuss their concerns with H.D.'s anxiety and tardy arrival. Id. ¶ 31.

4. Within a few days of that meeting, the District issued a form seeking permission to evaluate H.D. for a possible Service Agreement under § 504. Id. ¶ 32. The form specified that the evaluation would include record review, teacher and parent input, a classroom observation session, and homework monitoring. Id. The Parents gave their consent. Id.

5. On September 19, H.D.'s therapist provided a note to the District recommending a "504 plan" to accommodate his anxiety. Id. ¶ 33.

6. The school began evaluating H.D. on or around September 23, 2016. S-22 at 2.

ii. <u>The Evaluation Process</u>

1. Parental Input

    a. The Parents provided detailed input into the evaluation through a form issued by the District. <u>See</u> P-2. They briefly described H.D.'s history of therapy, and a family history of anxiety. <u>Id.</u> at 1. They checked off boxes and offered brief explanatory comments indicating his difficulties with homework and sleeping due to anxiety or OCD; with following directions; with attending to some non-preferred tasks; with listening; with social interactions; with transitioning among activities; and with math. <u>Id.</u> at 1.

    b. The Parents also told the District in a free-answer section that "[t]he way [H.D.'s] anxiety impacts academics is that he gets overwhelmed and worried about homework or tasks. He hides his worries and anxiety at school and then comes home and feels he 'can't do it' and is frustrated. His anxiety impacts his tests as well, and his self-esteem. He shuts down and all of his worries run through his head. He is learning coping strategies and mindfulness techniques in his work with [his therapist]. He does well with one on one instruction and attention. Classroom participation or 'answering questions in front of the class' can be very anxiety provoking." <u>Id.</u> at 1–2.

    c. On October 19, the Parents attended a District presentation about § 504 and special education. H.O.D. Findings ¶ 35; S-26 at 3. Afterwards, H.D.'s mother shared her thoughts about how H.D.'s anxiety manifested and the § 504 evaluation process with H.D.'s guidance counselor. S-26 at 3–4.

H.D.'s guidance counselor referred to that email in determining H.D.'s § 504 eligibility.  <u>Id.</u> at 3.

2.  The Evaluation Report

    a.  The final § 504 Evaluation Report ("the Evaluation Report") acknowledged and reproduced medical documentation of H.D.'s anxiety diagnosis.  S-30 at 2.

    b.  It stated that H.D.'s disability limits his concentration and sleep.  <u>Id.</u>  It incorporated his Parents' comments that his anxiety often affected homework completion—making it harder for him to sleep, and making it harder for him to get up in the morning and get to school on time.  <u>Id.</u>

    c.  The Evaluation Report also recounted his Parents' comments to the effect that "that anxiety impacts [H.D.'s] school performance.  [The Parents] feel that once he begins to worry about homework and other tasks he does not perform as expected.  They feel that he hides his worries and anxiety at school and then at home his frustrations surface."  <u>Id.</u> at 7.

    d.  The Evaluation Report included five teachers' ratings of his work habits in nine different areas, and summarized narrative teacher input that H.D. often seemed sleepy in class, that his materials were disorganized, that he had difficulty remaining focused and following along, and that he required "a significant amount of prompting to follow the established classroom procedures."  <u>Id.</u> at 6.

e.  According to the Evaluation Report, H.D.'s counselor observed H.D.'s behavior in the Science classroom, where H.D. reportedly engaged in some off-task behaviors and did not participate in answering questions.  Id.

f.  The Evaluation Report also summarized H.D.'s grades, attendance, standards-based assessment performance, and school nursing records.  Id. at 3–5.

g.  Ultimately, the Evaluation Report recommended that the District provide H.D. three accommodations, starting immediately:

   i.  "Homework must be a practice of a skill that [H.D.] has already demonstrated an ability to complete independently";

   ii.  "When given an assignment that involves a class presentation, [H.D.] will be given the option to present and if he is unable to do so, he will be given an alternate to or excused from the class";

   iii.  "When the homework assignment is being graded for accuracy rather than completion, [H.D.] will be able to meet with the Teacher to review the incorrect/incomplete questions and will be given at [sic] additional day to complete the assignment for a grade."  Id. at 7.

h.  On November 14, the District provided the Evaluation Report to the Parents and invited them to a November 23 meeting to discuss the Report.  H.O.D. Findings ¶ 51.

iii.  Events While the § 504 Evaluation was Progressing

   1.  Sometime in mid-to-late September, H.D. was moved from German to Spanish, id. ¶ 34, because he was struggling with German and because the Spanish

teacher, unlike the German teacher, was based in the school building and could help H.D. during the lunch hour, id. ¶ 34; S-30 at 5.

2.  In early November, H.D. encouraged, but did not participate in, a physical altercation in the cafeteria. H.O.D. Findings ¶¶ 37–38. The principal gave H.D. a two-day out-of-school suspension. Id. ¶ 39. The principal and an assistant principal contacted H.D. and his Parents later that evening because they had received reports of continued social media contacts concerning the altercation. Id. ¶ 40. The principal asked the Parents to take H.D.'s cell phone away; they did not do so. Id. The Parents felt that the principal humiliated H.D. on the call by making inappropriate comments and yelling. Id.

3.  As a consequence of the fight, H.D. was arrested. N.T. at 877:23-25. He eventually received probation. N.T. at 878:1-8. The record does not make clear the process by which H.D. was adjudicated.

4.  Shortly afterwards, the principal suggested that the District consider a "psych eval" for H.D. P-19 at 26.

5.  In mid-November, a team of District staff met to discuss whether H.D. should be considered for an IDEA evaluation. H.O.D. Findings ¶ 52. They concluded that, although H.D.'s behavioral issues included being "non-compliant, passive, manipulative, oppositional, instigat[ing], diagnosed with GAD" (generalized anxiety disorder), "[s]ymptoms associated with anxiety are not affecting his grades," but "[t]ardiness is having an effect on his grades." S-36.

iv.  Development and Implementation of the § 504 Service Agreement

1.  On November 23, the District issued a "Section 504 Prior Written Notice" that informed the Parents that the District proposed to "identify [H.D.] as a student

17

who is eligible for a Section 504 Accommodation Plan due to difficulties associated with symptoms/behaviors related to Anxiety," but that the District would not conduct "[a] full multi-disciplinary evaluation to determine the need for specially designed instruction under IDEA" because H.D. "d[id] not demonstrate a need for specially designed instruction although he is a student with a disability." S-34 at 2. The Parents consented to that course of action the same day. Id. at 1.

2. The Parents and District staff met that same day to develop a Service Agreement. H.O.D. Findings ¶ 53. The Service Agreement (S-38) provided for the following accommodations:

   a. Homework was required to be "a practice of a skill that [H.D.] has already demonstrated. Otherwise, the Teacher will conference with [H.D.] . . . to insure [sic] that he has the information and materials necessary to complete the assignment. . . . Teacher can use conferencing time to model the homework assignment and to clarify the directions and expectations.";

   b. "When given an assignment that involves a class presentation, [H.D.] will be given the option to present to the Teacher only, a small group of classmates, and/or prerecord the presentation.";

   c. "When the homework assignment is being graded for accuracy rather than completion, [H.D.] will be able to meet with the Teacher to review the incorrect/incomplete questions and will be given at least one(1) [sic] additional day to re-submit the assignment for a grade.";

d. "Frequent home-school communications if [H.D.]'s grade drops below a C and/or if [H.D.] does not re-submit homework."; and

e. "Preferential seating in proximity to the Teacher."

3. The Parents assented to the § 504 plan and thought it would help H.D. N.T. at 861:12-22.

4. H.D.'s teachers implemented the Service Agreement. H.O.D. Findings ¶ 55.

5. The school typically observes students receiving formal accommodations such as § 504 plans for fourteen to sixteen weeks to see if the accommodations are working. N.T. at 243:20–244:3.

v. <u>Events Following the Implementation of the § 504 Service Agreement</u>

1. All students at Kennett Middle School were permitted to seek help from teachers during the lunch period ("lunch support"). N.T. at 332:11–13. H.D.'s Service Agreement did not include any lunch support because lunch support was available to all students. <u>Id.</u> In early December of 2016, the District developed a schedule for H.D. to meet with specific teachers on certain days of the week. S-40. Shortly thereafter, H.D. "report[ed] that he is being pulled in too many directions at lunch and it feels impossible." <u>Id.</u> at 1.

2. Around the same time, H.D.'s Science teacher contacted H.D.'s former teachers to talk about H.D.'s performance and attendance because "[H.D.] is struggling with attendance and grades this year, and it seems to be getting worse." S-39 at 1.

3. In January, H.D.'s Spanish teacher reached out to H.D.'s mother twice to express concerns about H.D.'s performance, attendance, and work completion. P-20 at 1; P-24.

4. Around the same time, H.D. was one of a few dozen students invited to participate in an after-school skill-building intervention. See S-42. Although students with PSSA scores "on the cusp of proficiency" were invited to participate, it is not clear if that is why H.D. was invited. N.T. at 482:19–483:21; 485:20-24. Nor is it clear whether H.D. ever participated. N.T. at 484:12–16.

vi. IDEA Referral

1. In February, H.D.'s mother requested a meeting with District staff to discuss the fact that the Service Agreement was not working. N.T. at 627:8-11; 879:17-24. H.D.'s Parents met with District staff on February 17. S-46 at 1.

2. The District determined that the Service Agreement was not serving H.D.'s needs at around the tenth week[3] from the issuance of the Service Agreement. N.T. at 244:4-8. The District made this decision faster than it usually would: the District typically observes students receiving accommodations for fourteen to sixteen weeks before determining whether those accommodations are working. Id. at 243:19–244:3.

3. On March 1, 2017, the District, seeking H.D.'s Parents' consent to evaluate H.D. for special education, sent the Parents a Permission to Evaluate Form. S-52. The Parents gave their consent on March 10, see id. at 4–5, but for some reason did not return the form until March 21. N.T. at 56:25–57:1.

---

[3] Although the record is not completely clear, it appears from context that this ten-week period counted in-school weeks and excluded vacation weeks. This would place that determination by the District at around the same time as the mid-February meeting between H.D.'s Parents and District staff.

4. As it turned out, the Parents had arranged for H.D. to attend Outback, an out-of-state wilderness program, beginning on March 9, because they believed that H.D. was severely deteriorating. N.T. at 873:5-20, 878:12–879:16, 898:24–900:17, 913:3-19. H.D. was also on probation at the time, and his Parents feared that his deterioration might cause a probation violation. N.T. at 878:6–879:4.

5. The Parents removed H.D. to the wilderness program on March 9, and notified the District that H.D. would be attending the wilderness program later that day. S-57.

6. Because the Parents had removed H.D. to the wilderness program, the District unenrolled H.D. from Kennett Middle School on March 27, effective March 9, on advice of counsel. S-50, P-20 at 27.

7. The Parents objected to the unenrollment, P-20 at 27, although the Hearing Officer did not discuss this fact.

8. Although the Hearing Officer did not discuss these facts, the Parents and the District continued to communicate following H.D.'s unenrollment.

   a. On April 5, H.D.'s father asked the District's Director of Special Education whether the District would be continuing to evaluate H.D. P-10 at 3.

   b. On April 10, the District's Director of Special Education informed H.D.'s father that as a District resident, he was entitled to an evaluation for H.D. in accordance with IDEA. P-20 at 37.

   c. On April 17, H.D.'s father asked a few clarifying questions. Id. at 38.

   d. On April 18, the Director of Special Education replied that the District would continue with the evaluation "[w]hen/if [H.D.] returns to the

district." Id. On April 19, H.D.'s father acknowledged that email. Id. at 39.

e. There does not appear to have been further conversation of substance between H.D.'s Parents and the District concerning the evaluation.

vii. <u>Outback, Telos, and the Independent Educational Examination</u>

1. H.D. attended Outback until May 25, 2017. P-11.

2. While he was at Outback, H.D.'s Parents arranged for him to receive an Independent Educational Evaluation ("IEE") from an experienced psychologist. H.O.D. Findings ¶ 82–83.

3. The psychologist diagnosed H.D. with Generalized Anxiety Disorder and Persistent Depressive Disorder, and recommended that H.D. transition to a long-term residential treatment program including a therapeutic, highly structured educational program in a residential setting; small class sizes; preferential seating; and test and assignment accommodations. N.T. at 1099:20–1100:3; S-59 at 12–19.

4. She did not conclude whether H.D. was eligible for special education under IDEA or § 504. <u>See</u> S-59.

5. Outback recommended that H.D. enroll in a structured residential treatment program after he concluded the program. P-11 at 3.

6. After leaving Outback, H.D. began attending a year-round residential educational program, Telos, in Utah. H.O.D. Findings ¶¶ 92, 94.

7. It does not appear that the District was consulted on H.D.'s placement at Telos.

8. At Telos, H.D. received both traditional education and various interventions. Id. ¶¶ 100, 103–05, 107–13.

9. H.D. did not have an IEP at Telos.  Id. ¶ 101.

10. Telos planned to discharge H.D. in April 2018.  Id. ¶ 114.

11. The record does not reflect whether H.D. was in fact discharged or any subsequent events.

## IV.  **The Parties' Contentions**[4]

a.  The Parents' Motion

i.  Seventh Grade

1. The Parents argue that the District violated its Child Find obligations by failing to identify and evaluate H.D. by winter of his seventh-grade year.  Pl. Br. at 15, 20.

2. They maintain that there was a "mountain of evidence that H.D. was struggling academically and emotionally throughout the [seventh-grade] school year," and that the Hearing Officer "ignored" or "attempt[ed] to minimize" that evidence. Id. at 20.

   a. Among other things, they point to the evidence of H.D.'s misbehavior before seventh grade, H.D.'s declining grades, the emails among teachers about H.D.'s behavior, and his increasing late arrivals and absences.

   b. They also argue that the Hearing Officer erred in relying on District staff's testimony that they "did not observe [H.D.] to behave differently than other middle school students. . . ." Id. at 19–20 (quoting H.O.D. at 19–20).  The Parents consider this testimony improper because "it violates H.D.'s right to an individual determination as to whether his behavior was likely to

---

[4] The Court will not review the parties' contentions on issues not necessary to resolve this case.

indicate a disability, regardless of what other students are doing." <u>Id.</u> at 19–20.

    c. The Parent also direct the Court's attention to two District Court cases from this circuit that found Child Find violations under what they claim are analogous facts: <u>A.W. ex rel. H.W. v. Middletown Area School District</u>, No. 1:13–CV–2379, 2015 WL 390864 (M.D. Pa. Jan. 28, 2015) (Connor, C.J.) and <u>Jana K. ex rel. Tim K. v. Annville-Cleona School District</u>, 39 F. Supp. 3d 584 (M.D. Pa. 2014) (Rambo, J.).

ii. <u>Eighth Grade</u>

1. The Parents argue that the District failed H.D. at every step of the way in eighth grade.

2. First, the Parents argue that the Evaluation Report was so deficient as to amount to a Child Find violation. <u>Id.</u> at 23.

    a. They claim that it must be judged against the § 504 evaluation requirements found in 34 C.F.R. § 104.35, which they also argue must as a matter of law be the same as IDEA's requirements. <u>Id.</u> at 24 & n.8.

    b. They specifically claim that the Evaluation Report failed to meet these purportedly applicable standards in various ways, including its lack of individualized assessments, the lack of feedback from teachers H.D. had before eighth grade, and the lack of "any self-report assessment to understand H.D.'s knowledge and understanding of his struggles." <u>Id.</u> at 23–27.

    c. They also argue that the result of the Evaluation Report was inappropriately predetermined. <u>Id.</u> at 25–27.

3. Second, the Parents contend that the Service Agreement was seriously and even facially inadequate to address H.D.'s emotional needs, resulting in a denial of FAPE. Id. at 28–31.

4. Finally, they argue that the District had a continuing duty to evaluate H.D. even after he was removed to a private placement out of state, and that the District's failure to do so constituted a denial of FAPE. Id. at 31–34.

b. The District's Cross-Motion and Opposition

i. Seventh Grade

1. The District argues that the Hearing Officer correctly concluded that H.D. had a disability, but did not "demonstrate[] [a] need for special education because of a disability" during his seventh-grade year. Def. Br. at 13 (citing H.O.D. at 18–19).

2. The District provides two rebuttals to the Parents' insistence that pre-seventh-grade events should have put the District on notice of H.D.'s disability. First, that any such behavior occurred outside IDEA's two-year statute of limitations, so the Parents cannot make a Child Find claim regarding it. Id. at 10–11. Second, that in any event, that there is little evidence that pre-November 2015 events should have put the District on notice of H.D.'s disability. Id. at 11, 17.

3. Because H.D. did not demonstrate a need for special education, the District was not obligated to evaluate him. It is not obligated to "conduct a formal evaluation of every struggling student," id. at 12 (quoting J.S. v. Scarsdale Union Free. Sch. Dist., 826 F. Supp. 2d 635, 661 (S.D.N.Y. 2011)), and "[a] school's failure to a diagnose a disability at the earliest possible moment is not *per se* actionable . . ." id. (quoting A.P. ex rel Powers v. Woodstock Bd. of Educ., 572

F. Supp. 2d 221, 226 (D. Conn. 2008); citing <u>D.K. v. Abington Sch. Dist.</u>, 696 F.3d 233, 249 (3d Cir. 2012)).

4. Finally, even if H.D.'s seventh-grade need for special education might be clearer in hindsight, "[h]indsight evidence and 'Monday morning quarterbacking' are not appropriate decisional devices." <u>Id.</u> at 18 (quoting <u>Fuhrmann v. E. Hanover Bd. of Educ.</u>, 993 F.2d 1031, 1040 (3d Cir. 1993)).

ii. <u>Eighth Grade</u>

1. The District maintains that the Evaluation Report was adequate. <u>Id.</u> at 14–16.

   a. The District responds to the Parents' claims that the Evaluation Report failed to meet § 504's standards by pointing out that the standards cited by the Parents apply to IDEA and § 504 evaluations for special education and related services, and neither the District nor the Parents sought special education or related services for H.D. at the time that the Evaluation Report was being compiled. <u>Id.</u> at 16.

   b. The District also maintains that, in any event, the standards for IDEA evaluations and § 504 evaluations differ; it undertook to produce a § 504 evaluation; and it met the substantive standards applicable to a § 504 evaluation under 34 C.F.R. 104.35. <u>Id.</u> at 14–15.

2. The District also maintains that the Service Agreement was adequate to address H.D.'s educational needs. <u>Id.</u> at 19.

3. Finally, the District argues that the Hearing Officer correctly concluded that the Parents' unilateral removal of H.D. from school cut off their entitlement to further evaluation.

## V.    Legal Standards

a.    IDEA Framework

i.    "The IDEA protects the rights of disabled children by mandating that public educational institutions identify and effectively educate those children, or pay for their education elsewhere if they require specialized services that the public institution cannot provide." D.K., 696 F.3d at 244 (quoting P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 734 (3d Cir. 2009)).

ii.    "Accordingly, schools must: (1) identify children in need of special education services (Child Find); and (2) provide a FAPE to disabled students." Id.  To be liable for an IDEA violation, a school district must generally fail to meet both its Child Find and FAPE obligations. C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 66 (3d Cir. 2010) (citing Bd. of Educ. of Hendrick Hudson Ctrl. Sch. Dist. v. Rowley, 458 U.S. 176, 206–07 (1982)).

iii.    IDEA does not require schools to provide accommodations to every student who experiences a disability.  A "child with a disability" under IDEA is a child "who, by reason [of a specific disability], *needs special education and related services*." 20 U.S.C. § 1401(3)(A) (emphasis added); 34 C.F.R. § 300.8(a)(1).

1.    "Special education" means "specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability . . . ."  34 C.F.R. § 300.39(a)(1).

2.    "Specially designed instruction means "adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction— (i) To address the unique needs of the child that result from the

child's disability; and (ii) To ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children." Id. § 300.39(b)(3).

3. "Related services" means "transportation and such . . . supportive services as are required to assist a child with a disability from special education." Id. § 300.34(a).

iv. To summarize: IDEA does not require school districts to formally evaluate every student with a known disability. Districts must only evaluate those students who, because of their disabilities, are suspected of needing specially-designed instruction to address their unique needs or ensure their access to the general curriculum.

v. As a result, "schools need not rush to judgment or immediately evaluate every student exhibiting below-average capabilities, especially at a time when young children are developing at different speeds and acclimating to the school environment." D.K., 696 F.3d at 252. Although the quoted language refers to "young children," its implied premise—that some developmental unevenness is inevitable at certain points in children's lives—applies to preteens like H.D. as well.

vi. Parents are entitled to certain remedies when school districts fall short of their obligations.

vii. Generally, "[t]he IDEA grants district courts broad discretion in fashioning a remedy for a denial of a FAPE." Sch. Dist. of Phila. v. Post., 262 F. Supp. 3d 178, 197 (E.D. Pa. 2017) (Baylson, J.) (citing 20 U.S.C. § 1415(i)(2)(C)(iii)).

viii. Among the remedies to which parents may be entitled is a qualified right to tuition reimbursement. When a school district fails to provide a FAPE to a child with a

disability "in a timely manner," the parents may unilaterally remove their child to private school and seek reimbursement from the school district.  See 20 U.S.C. § 1412(a)(10)(C)(ii).

ix.   However, the reimbursement may be reduced or denied "if the equities so warrant," Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 247–48 (2009).  Relevant here, reimbursement may be reduced or denied if "the public agency informed the parents, through the notice requirements described in section 1415(b)(3) . . . of its intent to evaluate the child . . . but the parents did not make the child available for such evaluation . . ." id. § 1412(a)(10)(C)(iii)(II), or "upon a judicial finding of unreasonableness with respect to actions taken by the parents," id. § 1412(a)(10)(C)(iii)(III), or based on other equitable considerations.[5]  And "[i]n considering the equities, courts should generally presume that public-school officials are properly performing their obligations under the IDEA."  Forest Grove, 557 U.S. at 27.

b.  Section 504 Framework

i.   Section 504 of the Rehabilitation Act prevents public schools receiving federal funds from discriminating against individuals with disabilities.  See Ridley Sch. Dist. v. M.R., 680 F.3d 260, 280 (3d Cir. 2012).  Section "504's 'negative prohibition' is similar to the IDEA's 'affirmative duty' and also requires schools that receive federal financial assistance to 'provide a free appropriate public education to each qualified handicapped person who is in the recipient's

---

[5] Although these provisions are statutory, they reflect equitable considerations.  Forest Grove refers to a similar statutory provision, 42 U.S.C. 1412(a)(10)(C)(iii)(I)(bb), as a potential equitable consideration.  See Forest Grove, 557 U.S. at 247.

jurisdiction.'" Id. (quoting W.B. v. Matula, 67 F.3d 484, 492–93 (3d Cir. 2012));
see also 34 C.F.R. § 104.33(a).

1. An "appropriate" education constitutes "regular *or* special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of [§§] 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b) (emphasis added).

2. The Third Circuit has elaborated on this requirement: "To offer an 'appropriate' education under the Rehabilitation Act, a school district must *reasonably* accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits." Ridley Sch. Dist., 680 F.3d at 280 (emphasis added). "However, § 504 does not mandate 'substantial' changes to the school's programs . . . ." Id. (quoting Se. Cmty. Coll. v. Davis, 442 U.S. 397, 405 (1979)).

ii. Section 504 and its implementing regulations are also like IDEA in that they require that school districts evaluate "any person who, because of handicap, needs or is believed to need special education or related services before taking any action with respect to the initial placement of the person in regular or special education and any subsequent significant change in placement." 34 C.F.R. § 104.35(a). Evaluations conducted to fulfill a district's 34 C.F.R. § 104.35(a) obligations must meet certain substantive standards laid out in 34 C.F.R. § 104.35(b)-(c).

c. Pennsylvania Regulatory Claims

The Parents assert claims under Pennsylvania regulations implementing § 504 and IDEA. However, from their and the District's briefing, it appears that those claims can be considered under the same principles as their § 504 and IDEA claims. Therefore the Court will not address them separately.

d. ADA Claims

i. "[T]he substantive standards for determining liability under the Rehabilitation Act and the ADA are the same . . . ." Ridley Sch. Dist., 680 F.3d at 283 (citing McDonald v. Pa. Dep't of Pub. Welfare, 62 F.3d 92, 94–95 (3d Cir. 1995)).

ii. Therefore the Court's analysis of the Parents' IDEA and Rehabilitation Act claims will also resolve the Parents' ADA claims.

e. Standard of Review

i. "The party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." Ridley Sch. Dist., 680 F.3d at 270.

ii. The Court must, moreover, afford the Hearing Officer's decision "due weight." Rowley, 458 U.S. at 206. In this Circuit, "due weight" means a "modified de novo" review in which "[f]actual findings from the administrative proceedings are to be considered prima facie correct," and this Court must explain any rejection of them. Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S., 381 F.3d 194, 199 (3d Cir. 2004) (quoting S.H. v. State-Operated Sch. Dist. of City of Newark, 336 F.3d 260, 270 (3d Cir. 2003)).

iii. In addition, this Court must accept the Hearing Officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." Carlisle Area Sch. v. Scott P., 62 F.3d 520, 529 (3d Cir. 1995).

iv. However, this Court reviews the Hearing Officer's legal conclusions de novo. S.H., 336 F.3d at 270.

v. The Court must also be cautious in two respects.

1. First, it must center every step of its analysis on the facts known at the time rather than what is known now. Although it may consider later-acquired evidence, such evidence "should be used . . . only in assessing the reasonableness of the district's initial decisions regarding a particular IEP or the provision of special education services at all." Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 762 (3d Cir. 1995). In other words, "[n]either the statute nor reason countenance 'Monday Morning Quarterbacking.'" Id. (quoting Fuhrmann, 993 F.2d at 1040).

2. Second, the Court must not overstep. The Supreme Court has cautioned that IDEA's judicial review provision is not an "invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206.

## VI.    Discussion

### a.    Introduction

The Parents challenge the Hearing Officer's conclusions that the District met its obligations with regards to H.D. and that the Parents are not entitled to any relief. The Court will uphold those conclusions as follows.

### b.    Seventh-Grade Child Find Contentions

i.    The Hearing Officer was correct that the District need not have identified H.D. as a student with a disability in need of special education as early as the winter of his seventh-grade year, and therefore did not violate its Child Find obligations.

1.    Clearly, H.D. struggled in seventh grade more than he had in the past. However, "Child Find does not demand that schools conduct a formal evaluation of every struggling student." D.K., 696 F.3d at 249.

2.    District officials testified that H.D.'s declining grades and escalating behavioral problems were not so atypical for students of his age that they indicated a need for special education. N.T. at 354:5–355:8, 535:20–536:22, 542:15-24, 635:14–636:11, 663:21-25, 675:10–676:2, 692:2-7; P-19 at 39–41. The Hearing Officer considered this testimony "persuasive and compelling." H.O.D. at 19–20. The Court finds no reversible error in the Hearing Officer's ruling that the District met its Child Find duties in the seventh grade. Reversing the Hearing Officer would require disregarding testimony from District staff that the Hearing Officer found persuasive and compelling. To do so would be "to substitute [this Court's] own notion of sound educational policy for th[at]

of the school authorities which [it] review[s]," <u>Rowley</u>, 458 U.S. at 206.  This Court cannot and will not do so.  <u>Id.</u>

a.   The Parents' main response to that testimony is to insist that the Hearing Officer should have disregarded it "as a matter of law."[6]

   i.   First, they contend that relying on such evidence "violates H.D.'s right to an individual determination as to whether his behavior was likely to indicate a disability, regardless of what other students are doing."  Pl. Br. at 19–20.  The Court disagrees.  When dealing with and assessing H.D., H.D.'s teachers and other District staff relied on their years of experience with other students.  That does not mean that they did not treat H.D. as an individual.

   ii.  The Parents make a second, related argument about why such evidence is improper.  They claim that "[i]f all students exhibit signs of anxiety, that does not excuse the District from its legal obligation to identify and program for H.D."  <u>Id.</u> at 19.  Again, this Court disagrees.  Schools' Child Find obligations mean that they must identify students who need "special education."  <u>D.K.</u>, 696 F.3d at 244.  Under IDEA and its implementing regulations, "[s]pecial education" means "specially designed instruction, at no cost to the parents, to meet the *unique* needs of a child with a disability . . . ."  34 C.F.R. § 300.39(a)(1) (emphasis added).  If all students have certain educational needs associated with

---

[6] The Parents cite no law for this proposition.

anxiety, or any other condition, those needs are not "unique," and special education is not called for.

iii. Even if this Court were inclined to adopt the Parents' view of the law on either of the grounds urged, it would be forced to contend with an arguably contrary Third Circuit opinion. <u>D.K. v. Abington School District</u>, 696 F.3d 233, considered what constitutes "typical" age group behavior in assessing a claimed Child Find violation. <u>Id.</u> at 251 ("The School District was not required to jump to the conclusion that D.K.'s misbehavior denoted a disability or disorder because hyperactivity, difficulty following instructions, and tantrums are not atypical during early primary school years."). This Court will not hold that the Hearing Officer should have disregarded evidence of a kind previously considered by the Third Circuit.

3. The Parents also insist that the District violated its Child Find obligations because it was or should have been aware of pre-seventh-grade "off the wall" behavior that should have made the District particularly alert to the possibility that H.D. suffered from a disability requiring special education.

a. For evidence, the Parents point to a handful of isolated incidents of H.D. being disruptive, being anxious, or underperforming on individual assignments in second, third, fourth, and fifth grade; an unelaborated-upon note in his medical record from third grade; and evidence that H.D. suffered

from anxiety since the start of his schooling.[7]  P-17 at 1–10; S-5 at 3.  It is doubtful that this evidence, which was available to the Hearing Officer, shows that the District should have known since second grade that H.D. suffered from serious anxiety.  Even if it did, it does not demonstrate that H.D.'s anxiety affected his in-school behavior or performance such that the District should have been on notice by seventh grade that H.D. suffered from a mental health condition which required special education.  This is particularly true given that H.D. maintained excellent overall grades through sixth grade.  S-7 at 2–7.  Moreover, the Parents' specific contention that he engaged in "myriad disruptive behaviors . . . beginning in the 2nd grade" undermines their overarching contention that H.D.'s in-school behavior took an obvious turn for the worse in seventh grade.

4.  The Parents go on to refer this Court to two other IDEA cases whose facts and reasoning they claim demonstrate that the District fell short of its Child Find obligations in H.D.'s seventh-grade year: <u>A.W. ex rel. H.W. v. Middletown Area School District</u>, 2015 WL 390864, and <u>Jana K. ex rel. Tim K. v. Annville-Cleona School District</u>, 39 F. Supp. 3d 584.  Neither case supports the Parents' argument.

---

[7] The District insists that the Court should not consider these facts because they are outside of IDEA's statute of limitations.  This argument is a non sequitur.  The Parents have not alleged a Child Find violation predating November 2015.  They are arguing that facts predating November 2015 establish that District staff had knowledge that H.D. had a disability that should have made them alert that future problems with H.D. could stem from a disability.  It is proper for the Court to consider such facts.

a. <u>A.W.</u> does not merely fail to support Parents' arguments. It undermines them. It demonstrates that the District met its Child Find obligations in H.D.'s seventh-grade year. In <u>A.W.</u>, the court upheld the Hearing Officer's finding that the District need not have known that A.W. suffered from a disability until his grades for the first quarter of eighth grade issued. 2015 WL 390864, at *10. The court so held despite the fact that, during A.W.'s seventh-grade year, he received several failing quarterly and final grades and had forty-three absences (thirty-eight excused); that he had a full twenty-four absences (mostly unexcused) and multiple out-of-school suspensions for "defiance and disrespect" in the first quarter of eighth-grade alone; and that his mother met with school officials in the first quarter of eighth grade to discuss "A.W.'s absenteeism, behavioral issues, and academic performance." <u>Id.</u> at *3–4 & n.3. Moreover, the Middletown District's assistant superintendent demonstrated ongoing knowledge of the matter when, a few months later, he acknowledged to other Middletown District staff that "this [wa]s a very involved case that has spanned 4 years; not a typical truancy matter." <u>Id.</u> at *4 n.7. H.D.'s difficulties had a less serious impact on his in-school behavior and were less obvious to his school than A.W.'s. H.D. was absent less often than A.W., and H.D.'s absences were more often excused. He experienced less severe discipline. His grades appear to have declined about equally. His Parents' communications with school officials seem to have been of comparable clarity. And, finally, both school districts were on notice that there were some issues with the student.

Nonetheless, the school district need not have suspected that A.W. needed special education until it witnessed an entire quarter of such conduct and his grades had issued. <u>A.W.</u> therefore undermines the Parents' argument rather than supporting it.

b. <u>Jana K.</u> provides the Parents no more support. Their argument from <u>Jana K.</u> relies on nonspecific language about Jana K.'s circumstances that obfuscates the severity and obviousness of her mental distress. As the Parents read the <u>Jana K.</u> opinion, the court concluded in meaningful part that the "evidence as a whole paints a picture of a capable but underperforming child . . . , and demonstrates a connection between Jana's emotional condition and her academic performance. Her *under performance provided yet another signal that should have triggered the District's Child Find obligations.*" Pl. Br. at 22 (quoting <u>Jana K.</u>, 39 F. Supp. 3d at 602–03). However, in the very same paragraph as the Parents' quoted language, the court elaborates on Jana K.'s "emotional condition": in the 2009-2010 school year, Jana K.'s "grades began to decline contemporaneously with her being bullied, exhibiting signs of depression, and frequently visiting the nurse for 'moral support.' During this time period, Jana also appeared at school with scratches on her arms from 'cutting' and even cut herself while in school. Symptoms of Jana's worsening emotional condition persisted into the 2010–2011 school year, accompanied by an even more precipitous drop in her grades and threats of self-harm and suicide." <u>Jana K.</u>, 39 F. Supp. 3d at 602. The decline in her

grades was also dramatic: "by the third quarter, Jana was either failing or in danger of failing at least four classes." Id. at 592. Jana K.'s "under performance" was simply one indicator of her distress among many, most of which—underperformance included—were severer and more blatant than those H.D. displayed. Jana K., therefore, does not persuade the Court that the District failed in its Child Find obligations.

5. Finally, although neither the Hearing Officer nor the parties addressed this fact, the Court notes that towards the end of H.D.'s seventh-grade year, H.D.'s mother affirmed in an email that the Parents were not seeking an IEP for H.D. at that time. P-18 at 25.

    a. Her affirmation illuminates the state of affairs towards the end of H.D.'s seventh-grade year. H.D.'s anxiety showed more at home than at school. Nonetheless, H.D.'s Parents were not then seeking an IEP to address his anxiety. If H.D.'s Parents did not believe H.D. needed special education at that point, the District would not then have had have reason to believe that H.D. needed special education to address his anxiety.[8] The Hearing Officer

---

[8] In so concluding, the Court is guided by Carlisle Area School v. Scott P. ex rel. Bess P., 62 F.3d at 520, another IDEA case. The parents in Carlisle agreed to an IEP offered to their child for the 1991-1992 school year but later sought compensatory education for that year. Id. at 536 & n.8. Although the court "d[id] not construe the parents' failure to press their objections to the IEP when it was offered as a waiver, it casts significant doubt on their contention that the IEP was legally inappropriate since it suggests that the parents were also unaware prospectively that the 1991–92 IEP was unlikely to confer educational benefit." Id. at 536 n.8. Although Carlisle involved a failure to challenge an IEP, rather than a failure to seek an IEP, the basic point is the same. Evidence that parents approved of a school district's actions at the time may suggest that the parents' subsequent legal challenge relies too much on hindsight and Monday-morning quarterbacking. D.K. v. Abington School District, 696 F.3d at 233, similarly, concluded that parents' close involvement in and approval of a school district's pre-IDEA interventions weighed against a conclusion that the district violated its Child Find obligations. Id. at 252.

was correct to conclude, therefore, that the District did not violate IDEA by not evaluating him.

c.   Eighth-Grade Contentions

    i.   The Adequacy of the Evaluation Report and Service Agreement

        1.   The Evaluation Report

           a.   The parties dispute whether the Evaluation Report was sufficiently thorough according to certain statutory and regulatory standards.  They also dispute the sufficiency of the Service Agreement.  For the reasons that follow, the Hearing Officer was correct to uphold the adequacy of both the Evaluation Report and the Service Agreement.

           b.   The first question is what standard governs the Evaluation Report.

              i.   The Hearing Officer applied the standards found in the § 504 regulations at 34 C.F.R. § 104.35(c).  She concluded that the Evaluation Report met those standards.  H.O.D. at 22.

              ii.   The Parents argue that the standards of 34 C.F.R. § 104.35(c) apply, but were not met.  Pl. Br. at 23–27.  As part of their argument, the Parents claim that 34 C.F.R. § 104.35(c) imports the stringent standards contained in the IDEA regulations, 34 C.F.R. § 300.304.  Id. at 24 & n.8.

---

Of course, this is not to argue or hold that parents' decisions not to escalate matters will always defeat districts' obligations.  "[A] child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem)."  M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist., 81 F.3d 389, 397 (3d Cir. 1996) (concerning awards of compensatory education).  It is simply a recognition that parties' contemporaneous actions may be more probative of past circumstances than their after-the-fact legal arguments.

iii. The District argues that the standards found in the § 504 regulations do not apply, but were met if they do. Def. Br. at 14–16. The District does not explain exactly what standard would apply if the § 504 regulations did not, but the Court infers the District's position is that the applicable standards would be less stringent than 34 C.F.R. § 104.35(c). The District also disputes the Parents' argument that 34 C.F.R. § 104.35's standards for evaluation are the same as IDEA's. Id. at 14–15.

c. The Court will assume 34 C.F.R. § 104.35(c)'s standards apply. It concludes that the Hearing Officer correctly found that those standards were met.

d. First, the Court concludes that 34 C.F.R. § 104.35 does not import the standards contained in the IDEA regulations.

i. The text of the relevant regulations demonstrates that it does not. A party's interpretation of a regulation must find some support in the text. See Duquesne Light Holdings, Inc. & Subsidiaries v. Comm'r of Internal Revenue, 861 F.3d 396, 412 n.12 (3d Cir. 2017). Although § 504 contains several procedural requirements for districts' evaluations, its only substantive requirement is general: evaluations shall "draw upon information from a variety of sources, including aptitude and achievement tests, teacher recommendations, physical condition, social or cultural background, and adaptive behavior." See 34 C.F.R. § 104.35(b)-(c). IDEA, by contrast, has specific requirements that the district "[u]se a variety of assessment tools and strategies"

which must be "administered by trained and knowledgeable personnel," that the child be "assessed in all areas related to the suspected disability," and that "the evaluation [be] sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." <u>See</u> 34 C.F.R. § 300.304. IDEA, facially, mandates a more sweeping, thorough, and precise evaluation than § 504 does. Given that, the Parents' argument that the two provisions' actual requirements are identical must fail.

ii. Moreover, IDEA itself, viewed alone, dispels the Parents' argument that IDEA's standards should have applied to H.D.'s evaluation. The IDEA regulations govern districts' evaluations of children "with disabilities." <u>See</u> 34 C.F.R. § 300.301(a). But, as discussed earlier, the definition of "child with a disability" under IDEA is one who "needs special education and related services." 20 U.S.C. § 1401(3)(A); 34 C.F.R. § 300.8(a)(1). H.D. was not being considered for special education or related services. He was therefore not a "child with a disability" to whom any IDEA regulations would apply.

iii. The Parents' argue that, if the standards differ, an evaluation which met § 504's standards but not IDEA's might result in a child with an IDEA-eligible disability not receiving a FAPE. This is entirely true. But such an evaluation would expose the evaluator to liability under IDEA.

There is no need to rewrite the regulations in the manner the Parents urge to protect children with disabilities from inadequate evaluations.

e. Second, the Court concludes that the Hearing Officer was correct in concluding that the Evaluation Report was legally adequate under the standards of 104 C.F.R. § 104.35(b)-(c).

   i. That provision requires mainly that the District "(1) draw upon information from a variety of sources, including aptitude and achievement tests, teacher recommendations, physical condition, social or cultural background, and adaptive behavior, (2) establish procedures to ensure that information obtained from all such sources is documented and carefully considered . . . ." Id. § 104.35(c).

   ii. As the Hearing Officer said, "[a]lthough the Section 504 Evaluation did not include any formal assessments, the team gathered input from the Parents and teachers, and a classroom observation was conducted. Student's Anxiety Disorder was noted as well as how it was manifested at home and at school. Student's difficulties with homework, attention, frustration, and following directions were described from the Parents' and District's perspectives. Recommendations were made for accommodations to address the needs exhibited in the school environment."

   iii. Moreover, the Evaluation Report was ultimately effectual. It proposed several reasonable accommodations to mitigate the effect of his anxieties (as will be discussed *infra*).

iv. The Parents argue variously that the Evaluation Report was missing certain data, or analyzed those data differently, or drawn on more historical information, or that the outcome was "predetermined." The Court does not find any of their objections persuasive.

1. Some of the Parents' objections are simply rebutted by the record. For example, they contend that H.D.'s guidance counselor improperly "predetermined . . . that H.D.'s struggle in Spanish was due to the time of day of the class." Pl. Br. at 26. The record shows that H.D.'s Spanish attendance was the heaviest casualty of his absenteeism because it was the first class of the day. See, e.g., S-30 at 5, Pl. Br. at 27. Even if his guidance counselor had "predetermined" that H.D.'s struggle in Spanish was "due to the time of day of the class," that determination would not be inaccurate or minimize the impact of H.D.'s anxiety on his school performance.

2. Others of the Parents' objections might be well taken if the Evaluation Report was required to meet the exacting standards of IDEA, 34 C.F.R. § 300.304. Those standards, however, did not apply here.

f. Because the Evaluation Report met the standards of 104 C.F.R. § 104.35(b)-(c), the Court will not consider whether (as the District's brief suggests) some other, less stringent standard actually governs the Evaluation Report.

g. Here, as earlier, the Parents' agreement suggests that the District acted reasonably. The Parents consented at the start of the process to the scope

of the evaluation.  They consented at the end of the process to the decision

not to evaluate H.D. and to the Service Agreement which resulted from the

Evaluation Report.  These facts do not bar, but do undercut, their present-

day claim that the Evaluation Report was inadequate.  <u>Carlisle Area Sch.</u>,

62 F.3d at 536 n.8.

h.  In conclusion, the Court finds no basis on which to overturn the Hearing

Officer's conclusion that the Evaluation Report was adequate.

2.  The Service Agreement

a.  The Parents insist that that the Hearing Officer erred because the Service

Agreement was deficient and that H.D. was therefore denied a FAPE.  <u>E.g.</u>,

Pl. Rep. Br. at 9–10.  The Court will not overturn this aspect of the Hearing

Officer's Decision.

b.  The Court reviews the Hearing Officer's Decision and the record mindful

that the Parents agreed to the Service Agreement and, at the time, thought

that it would help H.D.  N.T. at 861:12-22.  The Parents' consent to the

Service Agreement and belief that it would help H.D. is irreconcilable with

their present insistence that the Service Agreement was facially deficient.

Instead, the Parents' consent to the Service Agreement and belief that it

would help H.D. support the Hearing Officer's conclusion that the Service

Agreement was reasonable at the time it was adopted.  <u>See</u> <u>Carlisle Area</u>

<u>Sch.</u>, 62 F.3d at 536 n.8.

c.  "To offer an 'appropriate' education under the Rehabilitation Act, a school

district must reasonably accommodate the needs of the handicapped child

so as to ensure meaningful participation in educational activities and meaningful access to educational benefits." <u>Ridley Sch. Dist.</u>, 680 F.3d at 280. The Parents argue, in essence, that the Service Agreement failed to meet this standard.

d. In one sentence that neatly summarizes the thrust of their entire argument, the Parents insist that the Hearing Officer erred because the plan "contain[ed] *no* meaningful supports (<u>i.e.</u>, it simply reduced homework demands) (S-38), and did not even purport to provide interventions to address H.D.'s anxiety and depression." <u>Id.</u> at 10–11 (emphasis in original). This argument is meritless.

    i. Homework was a significant anxiety trigger for H.D. It was the Parents who told the District as much through their input into the Evaluation Report on which the District based the Service Agreement via a form. A form the Parents filled out about H.D. asked "What specific concerns do you have about your child at this time?" P-2 at 1. The first two sentences of the Parents' response explained that homework was a significant anxiety trigger for H.D.: "[t]he way [H.D.'s] anxiety impacts academics is that he gets overwhelmed and worried about homework or tasks. He hides his worries and anxiety at school and then comes home and feels he 'can't do it' and is frustrated." <u>Id.</u> The Evaluation Report substantially restated this input. S-30 at 7.

    ii. The Service Agreement addressed this significant anxiety trigger through accommodations that reduced both the difficulty and import of

H.D.'s homework.[9]   The Service Agreement was plainly designed to reduce the incidence and severity of H.D.'s feelings that he "can't do it."[10]

  iii.   The Parents' own input into the Service Agreement, therefore, belies their argument.   The Service Agreement did not "simply reduce[] homework demands" without "even purport[ing] to provide interventions to address H.D.'s anxiety and depression," Pl. Rep. Br. at 10–11.   Reducing homework demands was, obviously, itself an intervention to address H.D.'s anxiety and depression.

  iv.   And, as the Hearing Officer found, it was a reasonable one based on what the District knew at the time.

  e.   The Parents also argue that the Hearing Officer erred because the Service Agreement failed to accommodate H.D.'s social needs.  E.g., Pl. Br. at 29–30.   Again, this objection collapses upon a rudimentary review of the Service Agreement.

---

[9] Specifically, it reduced the potential difficulty of H.D.'s homework to "practice of a skill that [H.D.] has already demonstrated an ability to complete independently," required teachers to give him more support on homework, and diminished the consequences of any errors by providing an opportunity to conference with a teacher about and then re-submit any homework graded for completion.  S-38.

[10] In a different section, the Parents' brief summarizes some of the testimony of the Parents' independent educational expert as follows: "[Dr. Jenkins] explained how his anxiety was affecting his grades, not just through his school avoidance but also his ability to complete his school work at all.  (NT 1091.)  She explained how he was very anxious about doing things correctly and if he felt that he could not do things correctly, he would either not do them or do them only partially.  (Id.)"  Pl. Br. at 36.  This testimony tends to support the point that ensuring that H.D.'s homework was limited to "skill[s] that [H.D.] has already demonstrated an ability to complete independently" would diminish the impact of his anxiety on his schoolwork and thereby on his grades.

i. One accommodation provided H.D. the opportunity to avoid making in-class presentations to the entire class. S-38. Instead, he could present only to the Teacher, or a small group of classmates, or to prerecord his presentations. Id. This measure appears to have been a response to the Parents' written input that "[c]lassroom participation or 'answering questions in front of the class' can be very anxiety provoking," P-2 at 2, and his mother's emailed comment that H.D. "worries especially about going to the white board or black board in front of the class." Once again, the Service Agreement addressed an anxiety trigger to which the Parents had alerted the District.

ii. This may not have completely remediated H.D.'s anxieties concerning the classroom environment. But the District's obligation was to provide an "appropriate" education, not the "best possible" one. Molly L. ex rel B.L. v. Lower Merion Sch. Dist., 194 F. Supp. 2d 422, 436 (E.D. Pa. 2002) (DuBois, J.) (citing Carlisle Area Sch., 62 F.3d at 533–34).

iii. As the Hearing Officer found, this accommodation appears to have met that standard.

f. The Parents also contend that the Hearing Officer erred because the Service Agreement did not address H.D.'s absenteeism. E.g., Pl. Rep. Br. at 11. This argument, like those before it, fails based on the record.

i. The Parents told the District that H.D.'s absenteeism and tiredness resulted in part from his anxiety affecting his sleep. See S-26 at 4 (H.D.'s mother emailed his guidance counselor that tests, social

difficulties, and presenting in class were among "the issues that literally keep him up at night worrying"); P-2 at 1 (the Parents informed the District that H.D. had trouble with sleeping "sometimes due to anxiety or OCD."); <u>see also</u> S-30 at 2 ("[H.D.]'s parents report that his sleeping habits are regularly impacted by the amount of anxiety he experiences surrounding homework . . . . As a result, H.D. is frequently late to school because he has difficulty getting up in the morning.").

ii. Since the Service Agreement contained accommodations intended to address two of H.D.'s anxiety triggers, it would have been reasonable at the time to assume that the Service Agreement would also have mitigated H.D.'s difficulties sleeping and, thereby, his absenteeism.

iii. Again, it is immaterial that the Service Agreement may not have addressed every one of H.D.'s anxiety triggers or used the best possible remedial techniques to address his absenteeism. The District's duty under § 504 was to mitigate the impact of H.D.'s disability, not to erase it. <u>Molly L.</u>, 194 F. Supp. 2d at 436 (citing <u>Carlisle Area Sch.</u>, 62 F.3d at 533–34).

iv. Once again, as the Hearing Officer found, the Service Agreement's accommodations were reasonably designed, based on what was known at the time, to provide H.D. an appropriate education.

g. Finally, the Parents appear to contend that the Court should infer that the Service Agreement was legally deficient because it failed. Pl. Br. at 31. But hindsight alone is a tenuous basis on which to find a school district liable.

See Susan N., 70 F.3d at 762. Without more persuasive evidence that the Service Agreement was unreasonable at the outset, its subsequent failure does not create liability.

    h. The Court will affirm the Hearing Officer's conclusion that the Service Agreement represented a reasonable attempt to alleviate H.D.'s particular educational difficulties.

ii. <u>The Timeliness of the District's Ultimate Decision to Evaluate H.D. for Special Education</u>

    1. The District's March 1 decision to evaluate H.D. for special education was timely, as the Hearing Officer found.

    2. Schools must identify children in need of special education within "a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." <u>Ridley Sch. Dist.</u>, 680 F.3d at 271–72 (quoting <u>W.B.</u>, 67 F.3d at 501). There is no "'bright-line rule' as to what constitutes a reasonable time. Rather, [courts in this circuit] employ a case-by-case approach and assess whether the school district's response was reasonable 'in light of the information and resources possessed by the district at a given point in time.'" <u>Id.</u> at 272 (quoting <u>W.B.</u>, 67 F.3d at 501).

    3. The Hearing Officer concluded that the District acted within reasonable time. The Court will uphold that conclusion.

    a. A school district's appropriate interim non-IDEA interventions militate for the conclusion that the district's eventual IDEA proceedings are timely. <u>D.K.</u>, 696 F.3d at 252.

b. Here, the District began a § 504 evaluation process in mid-September of H.D.'s eighth-grade year. Based on the resulting Evaluation Report, it implemented a Service Agreement. After the Service Agreement appeared to have failed, it issued an IDEA Permission to Evaluate, beginning IDEA proceedings. Both the Evaluation Report and the Service Agreement were appropriate when created. The District also offered H.D. smaller interim interventions, such as the lunchtime meetings with teachers.

c. The District's eventual decision to evaluate H.D. for special education was, therefore, itself done within reasonable time.

iii. <u>The District's Decision to Stop Evaluating H.D. After H.D.'s Removal</u>

1. The Hearing Officer was correct to conclude that the District was entitled to pause its evaluation of H.D. after H.D.'s Parents removed him from the District and the District did not thereby deny H.D. a FAPE. However, the Court must undertake its own review of the applicable law.

a. The Hearing Officer concluded that the Parents' unilateral decision to send H.D. to an out-of-state program cut off the District's duty to evaluate as a matter of law based on <u>Great Valley School District v. Douglas M</u>., 807 A.2d 315 (Cmwlth. Ct. Pa. 2002). H.O.D. at 23–24. <u>Great Valley</u> held that, in the absence of an IDEA violation by the school district, a school district cannot be required to assume the burden of evaluating a student who has been unilaterally removed to a private placement across the country. 807 A.2d at 321–22.

b. The Parents attempt to distinguish <u>Great Valley</u> on two grounds. Neither succeeds.

i. First, they contend that <u>Great Valley</u> is inapposite because its holding is limited to cases where the unilateral placement was not preceded by a Child Find violation, and the District committed Child Find violations. Pl. Br. at 31–32. This Court has already affirmed the Hearing Officer's findings that the District did not commit any Child Find (or other) violations. The Parents therefore cannot distinguish <u>Great Valley</u> on these grounds.

ii. Second, the Parents point out that here, the record is "replete with examples of Parents discussing concerns and requesting accommodations for H.D. prior to his removal," while in <u>Great Valley</u>, there had been no "prior discussions with school officials about possible accommodations." <u>Id.</u> at 31. Although true so far as it goes, this argument is not on point. <u>Great Valley</u>'s holding does not turn on whether the parents have effectively communicated with the school district prior to the unilateral placement except to the extent that (in a different case), such communications may bear on whether a Child Find violation occurred.

c. As the Court reads <u>Great Valley</u>, the Hearing Officer was correct to rely on it and applied it correctly.

d. However, the Court's review of issues of law is de novo. <u>S.H.</u>, 336 F.3d at 270. The question of whether the District had a continuing duty to evaluate H.D. after his Parents unilaterally removed him is one of law. The Court's review of that issue is therefore de novo. And on de novo review, the <u>Great</u>

*Valley* decision—a state-court decision construing federal law, see 807 A.2d at 319—does not bind this Court.

2. Although <u>Great Valley</u> is not binding, it can be taken as persuasive authority given the absence of Third Circuit caselaw to the contrary.

    a. Again, <u>Great Valley</u> held that, in the absence of an IDEA violation by the school district, a school district cannot be required to assume the burden of evaluating a student who has been unilaterally removed to a private placement across the country. <u>Id.</u> at 321–22.

    b. The <u>Great Valley</u> decision, after reviewing federal cases, concluded that "[u]nilateral private enrollment is itself a departure from the cooperative placement process [preferred by IDEA], and out-of-state unilateral enrollment is a greater departure." <u>Id.</u> at 321. It also cited the principle that unilateral private placement is done at the parents' own risk. <u>Id.</u> at 320–21.

    c. The court concluded that, because unilateral removal is generally done at the parents' own risk, and simultaneously deprives school districts of cooperative process, parents could not inflict the burden of an out-of-state evaluation on the school district. <u>Id.</u> at 321–22.

    d. This Court agrees with the <u>Great Valley</u> panel's reasoning and will adopt the case's holding.[11]

---

[11] The Parents do not direct the Court to, and the Court is not aware of, any contrary Third Circuit precedents. Instead, they cite several alternative sources of persuasive authority. Pl. Br. at 32–34. None persuades.

<u>District of Columbia v. Abramson</u>, 493 F. Supp. 2d 90 (D.D.C. 2007), like <u>Great Valley</u>, turned on the existence of a procedural IDEA violation prior to the parents' unilateral removal of the child. <u>Id.</u> at 86–87. There is no comparable violation here.

e. The <u>Great Valley</u> decision's reasoning also accords with the provisions of IDEA allowing the Court to reduce tuition reimbursements if "the public agency informed the parents, through the notice requirements described in section 1415(b)(3) . . . of its intent to evaluate the child . . . but the parents did not make the child available for such evaluation . . ." <u>id.</u> § 1412(a)(10)(C)(iii)(II), or "upon a judicial finding of unreasonableness with respect to actions taken by the parents," <u>id.</u> § 1412(a)(10)(C)(iii)(III).[12] Both provisions enact the principle that school districts may not be made "liable for procedural violations that are thrust upon [them] by uncooperative parents." <u>C.H.</u>, 606 F.3d at 69.

f. Here, the District had not violated IDEA when H.D. was removed on March 9, 2017. The Parents could not then, by the act of unilaterally removing H.D., unilaterally burden the District with an out-of-state evaluation. Their removal of H.D. from the District therefore cut off the District's obligation to evaluate him.

3. To summarize: the factual record fully supports the Hearing Officer's conclusion that the Parents' removal of H.D. cut off the District's duty to

---

James ex rel. James v. Upper Arlington City Sch. Dist., 228 F.3d 764 (6th Cir. 2000) turned on the parents "specifically approach[ing] the school district about re-enrollment and obtaining a new IEP." <u>Id.</u> at 768. <u>Moorestown Tp. Bd. of Educ. v. S.D.</u>, 811 F. Supp. 2d 1057 (D.N.J. 2011) turned on similar facts. <u>Id.</u> at 1067. Here, although the parties continued to discuss whether the District would evaluate H.D. post-removal for about a month after H.D.'s removal, the Parents did not clearly request further evaluation in anticipation of possible reenrollment. Both <u>James</u> and <u>Moorestown</u> are therefore distinguishable.

[12] Although these provisions are statutory, they reflect equitable considerations. <u>Forest Grove</u> refers to a similar statutory provision, 42 U.S.C. 1412(a)(10)(C)(iii)(I)(bb), as a potential equitable consideration. <u>See</u> <u>Forest Grove</u>, 557 U.S. at 247.

evaluate. Specifically, the record fully supports the Hearing Officer's conclusions on the following topics:

a. The District's decision to evaluate H.D. for special education, described at H.O.D. Findings ¶¶ 61–62;

b. H.D.'s removal and unenrollment from Kennett Middle School, described at H.O.D. Findings ¶¶ 62–64;

c. H.D.'s experience at Outback, described at H.O.D. Findings ¶¶ 68–81;

d. The Independent Educational Evaluation, described at H.O.D. Findings ¶¶ 82–91; and

e. H.D.'s experience at Telos, described at H.O.D. Findings ¶¶ 92–114.

4. Further, in their opening brief, the Parents virtually ignore the fact that they removed H.D. from school. After the District made a compelling argument that the Hearing Officer correctly concluded that the withdrawal was of great legal significance, the Parents' reply brief attempted to impose some legally unsupportable arguments that the District should have basically "trailed" H.D. wherever he was. The law does not support these arguments.

5. The Hearing Officer therefore correctly conclude that the District did not deny H.D. a FAPE by ceasing to evaluate him after his Parents removed him from the District.

## VII. Remedies

a. Reimbursements for the Cost of H.D.'s Alternative Placements

i. The Parents seek reimbursement for H.D.'s alternative educational placements, both of which were unilateral.

ii. "If the parents of a child with a disability . . . enroll the child in a private . . . secondary school without the consent of or referral by the public agency, a court . . . may require the agency to reimburse the parents for the cost of that enrollment if the court . . . finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." 20 U.S.C. § 1412(a)(10)(C)(ii).

iii. As explained above, the District did not fail to make a FAPE available to H.D. in a timely manner prior to H.D.'s enrollment at Outback. Nor did it fail to make a FAPE available to H.D. in a timely manner prior to H.D.'s subsequent enrollment at Outback.

iv. The Court will therefore affirm the Hearing Officer's decision that the Parents are not entitled to reimbursement for the costs of H.D.'s alternative educational placements.

b. <u>Reimbursement for the Cost of the Independent Educational Evaluation</u>

i. The Parents seek reimbursement for the cost of the IEE performed by Dr. Jenkins.

ii. Under 34 C.F.R. § 300.502, a parent may seek to have an IEE performed at "public expense if the parent disagrees with an evaluation obtained by the public agency . . . ."

iii. The Hearing Officer noted that the District's purported failure to evaluate H.D. could "be considered the functional equivalent of providing an inappropriate evaluation for purposes of considering an IEE issue." H.O.D. at 23. Nonetheless, the Hearing Officer held that since the Parents' unilateral removal of H.D. cut off

the District's duty to evaluate, the District could not be held liable for the cost of the IEE. Id.at 23–24.

iv. Since the Court agrees that the Parents' unilateral removal of H.D. cut off the District's duty to evaluate, it also agrees that the unilateral removal cut off any possible District liability for the IEE. The Court will therefore affirm the Hearing Officer's decision that the Parents are not entitled to reimbursement for the IEE.

c.  Award of Compensatory Education

i. The Parents seek an award of "compensatory education[, which] requires a school district to provide education past a child's twenty-first birthday to make up for any earlier deprivation." M.C., 81 F.3d at 395.

ii. "A disabled student's right to compensatory education accrues when the school knows or should know that the student is receiving an inappropriate education." D.K., 696 F.3d at 249 (quoting P.P., 585 F.3d at 739). A district should know that a student is receiving an inappropriate education such that a right to compensatory education accrues when it knows that the student needs evaluation for special education services. P.P., 585 F.3d at 739.

iii. The school district is entitled to have any award reduced by the amount of "time reasonably required for the school district to rectify the problem." Id. (quoting M.C., 81 F.3d at 391–92).

iv. Here, the date on which the District should have known that that H.D. should be evaluated for special education services was on or around February 17 of his eighth-grade year, when the Parents and the District met to discuss the failure of the Service Agreement. The District sought permission to evaluate H.D. shortly

thereafter, on March 1. The Parents removed H.D. from the state on March 9. This was well within the time reasonably required for the District to rectify the problem. The Parents did not consent to the District's evaluation until after they removed H.D. to Outback, and no evaluation could commence until the Parents consented. Because the District acted reasonably swiftly once it knew H.D. required special education, no right to compensatory education accrued prior to H.D.'s removal to Outback.

v.   After HD was enrolled at Outback, he had no further right to compensatory education. "[C]ompensatory education is not an available remedy when a student has been unilaterally enrolled in private school." P.P., 585 F.3d at 739.

vi.   In sum, H.D. is not entitled to an award for compensatory education.

d.   Fees and Costs

i.   The Parents seek an award of their fees and costs related to the due process hearing and this appeal.

ii.   The Court may award fees, including expert fees, and costs to plaintiffs who prevail on § 504 claims under 42 U.S.C. § 2000e-5(k), and plaintiffs who prevail on IDEA claims under 20 U.S.C. § 1415(i)(3)(B).

iii.   As the Parents have not prevailed on any of their claims, they are not entitled to any award of fees or costs.

**VIII. Conclusion**

a.   The Hearing Officer's Decision is AFFIRMED.

b.   The District's Motion for Judgment on the Administrative Record is GRANTED, and the Parents' DENIED.

c.   An appropriate Order issued on September 26, 2019.  ECF 16.


**Date:  10/4/19**                              **/s/ Michael M. Baylson**
                                                 _____

                                                 **MICHAEL M. BAYLSON**
                                                 **United States District Court Judge**

O:\CIVIL 18\18-3345 HD v Kennett Consolidated Sch Dist\18cv3345 Memo re MJAR.docx